30 U.S. 529 (____)
5 Pet. 529
JOHN WINSHIP AND OTHERS, PLAINTIFFS IN ERROR
vs.
THE BANK OF THE UNITED STATES, DEFENDANT IN ERROR.
Supreme Court of United States.

*541 The case was argued by Mr Sprague, for the plaintiffs in error: and by Mr Sergeant and Mr Webster, for the defendants.
*552 Mr Chief Justice MARSHALL delivered the opinion of the Court.
This was an action brought in the court for the first circuit and district for Massachusetts, against John Winship, Amos Binney and John Binney, merchants and partners, trading under the name and firm of John Winship, as indorser of several promissory notes, made by Samuel Jacques, Jun. At the trial the maker was called by the plaintiffs, and sworn. He was objected to by the defendants as an interested witness, an instrument being produced purporting to be a release in the name of John Winship of all liability of the maker on the said notes. The operation of the said instrument, as a release of the notes in suit, was controverted by the plaintiffs. It is unnecessary to state the instrument, or to discuss the question arising on it, or on the competency of the witness; because the court is divided on the effect of the instrument and on the competency of the witness.
The witness testified that he knew from general reputation that the defendant, John Winship, was concerned with the other defendants, Amos and John Binney, in the soap and candle business; that Winship avowed the partnership; that he had dealings with Winship soon after its commencement, and supplied him with rosin, for which he sometimes gave a note signed John Winship, which the witness always took on the credit of the Binneys. Winship and the witness were in the habit of lending their names to each other, and Winship always represented that the notes made or indorsed by the witness for his accommodation were for the use of the firm.
Several other witnesses were examined on the part of the plaintiff to prove the partnership, whose testimony was rendered unimportant by the production of the articles themselves. The defendants exhibited them, and they are in the following words:
"The memorandum of an agreement made this twenty-fifth day of September 1817, between Amos Binney and John Binney of Boston, county of Suffolk, and John Winship, of *553 Charlestown, county of Middlesex, all in the commonwealth of Massachusetts, for the manufacture of soap and candles, witnesseth:
"That the said Amos and John Binney agree to furnish for the above purpose the sum or capital stock of ten thousand dollars, at such times as may be wanted to purchase stock or materials for carrying on the aforesaid manufacture; and the said John Winship agrees on his part to conduct and superintend the manufactory, and to pay his whole and undivided attention to the business; to manufacture or cause to be manufactured, every article in the best possible manner, and to use his utmost skill and exertions to promote the interest of the establishment, under the name and firm of John Winship, and without any charge for his personal labours, and to keep a fair and regular set of books and accounts, open and subject at all times to the inspection of the parties interested in the concern, and annually on the first day of October of each year, to make and exhibit a statement of the state of the business, the amount of purchases and sales, and the profits, if any, of the business, that have been made; the expenses of conducting the business; and the profits to be divided in the following manner: to say, from the profits is to be paid interest for the capital stock of ten thousand dollars, at the rate of six per centum per annum, all expenses of rent, labour, transportation, fuel, and utensils, that it may be necessary to purchase or have, and the remainder of the profits, if any, to be equally divided between the said Winship and Binneys, one half thereof to the said John Winship and the other half to A. and J. Binney; and in case no profit should be made, but a loss, then the loss is to be borne and sustained one half by the said A. and J. Binney, and the other half by the said John Winship.
"The agreement to continue in force for two years from the first day of October next ensuing, and then for a further term, provided all parties agree thereto. And to the true and faithful performance of the foregoing conditions each party bind themselves to the other in the penal sum of ten thousand dollars."
On the back of which were receipts signed by said Winship, acknowledging that he had received of Amos Binney one thousand dollars on the 6th of September 1817, and four *554 thousand dollars on the 9th of October 1817; and on the 27th of December 1827 he had in his hands ten thousand dollars, as said Amos's proportion of the capital; and that he had received of John Binney two thousand five hundred dollars on the 1st of October 1817, and five hundred dollars on the 3d of November 1817, and five hundred dollars on the 17th of November 1817, and one thousand five hundred dollars on the 13th of June 1820, and on the 2d of June 1821, he had in his hands ten thousand dollars, as said John's proportion of the capital stock.
They also gave in evidence a bond given by said Winship to said Amos, on the 25th of September 1817, in the penal sum of ten thousand dollars, with the condition following:
"The conditions of this obligation are such, that whereas the above bounden John Winship has this day made an agreement with Amos Binney and John Binney, both of Boston aforesaid, for the purpose of carrying on a manufactory of soap and candles on joint account of the parties aforesaid; and whereas the said A. Binney hath engaged to indorse the notes given by the said John Winship, for the purchase of stock and raw materials for manufacturing, when necessary to purchase on a credit, and in consideration of which the said John Winship hath engaged not to indorse the notes, paper, or become in any manner responsible or security for any person or persons other than the said Amos Binney, for the term of two years from the first day of October 1817.
"Now, therefore, if the said John Winship shall faithfully observe the conditions, and wholly abstain from becoming the surety or indorser of any person to any amount other than the same Amos Binney for the aforesaid term of two years from the first day of October 1817, then this obligation to be void and of no effect; otherwise to remain in full force and virtue."
The defendants also produced witnesses whose testimony furnished some foundation for the presumption that the money arising from the notes, on which the suits were brought, was not applied by Winship to the purposes of the firm. Other testimony led to the belief that a part, if not the whole of the money was so applied. All the notes in suit were discounted by and applied to the credit of John Winship.
*555 The testimony being closed, the counsel for the defendant insisted, First, "that the said co-partnership between them was, in contemplation of law, a secret co-partnership, and did not authorize the giving of credit to any other name than that of the said Winship;" but to this the counsel for the plaintiffs did then and there insist before the said court, that this was an open or avowed, and not a secret co-partnership. And the presiding justice of the said court did state his opinion to the jury on this point, as follows: "That according to his understanding of the common meaning of `secret partnership,' those were deemed secret, where the existence of certain persons as partners was not avowed or made known to the public, by any of the partners. That where the partners were all publicly known, whether this was done by all the partners, or by one only, it was no longer a secret partnership; for secret partnership was generally used in contra-distinction to notorious and open partnership: that whether the business was carried on in the nam and firm of one partner only, or of him and company, would, in this respect, make no difference: that if it was the intention of the Binneys that their names should be concealed, and the business of the firm was to be carried on in the name of Winship only; and yet that Winship, against their wishes, in the course of the business of the firm, publicly did avow and make known to the partnership, so that it became notorious who were the partners; such partnership could not, in the common sense of the terms, be deemed any longer a secret partnership: that if `secret,' in any sense, it was under such circumstances, using the terms in a peculiar sense. That, however, nothing important in this case turned upon the meaning or definition of the terms `secret partnership;' since the case must be decided upon the principles of law, applicable to such a partnership, as this was in fact proved to be. That there was no stipulation for secrecy as to the Binneys being partners, on the face of the original articles of co-partnership; and when those articles, by their own limitation, expired, the question what the partnership was, and how it was carried on for the future; whether upon the same terms as were contained in the original articles or otherwise; was matter of fact from the whole evidence; that if the evidence was believed, Winship constantly avowed the partnership, and that the Binneys were *556 his partners in the soap and candle manufactory business, and obtained credit thereby."
But he left the jury to judge for themselves as to the evidence.
Second exception. And the said counsel of the defendants did then and there further insist, that the said jury had a right to infer from the evidence aforesaid, notwithstanding the entries of the shipments in the invoice book kept by said Winship, that the said Amos Binney and John Binney had no knowledge thereof; and therefore could not be presumed to have adopted or ratified the conduct of said Winship making said shipments. But the presiding judge did then and there instruct the jury as follows:
"That whether the said Amos and John Binney, or either of them, knew of the said entries or not, was matter of fact for the consideration of the jury, upon all the circumstances of the case. That, ordinarily, the presumption was, that all the parties had access to the partnership books, and might know the contents thereof. But this was a mere presumption from the ordinary course of business, and might be rebutted by any circumstances whatsoever, which either positively or presumptively repelled any inference of access; such for instance, as the distance of place in the course of business of the particular partnership, or any other circumstances raising a presumption of non-access."
And he left the jury to draw their own conclusion as to the knowledge of the Binneys, of the entries in the partnership books, from the whole evidence in the case.
Third exception. And the said counsel of the defendants did then and there further insist, that by the tenor of the said recited articles of agreement and bond, the said Winship had no right or authority to raise money on the credit of the said firm, or to bind the firm by his signature for the purpose of borrowing money. But the presiding judge did then and there instruct the jury as follows:
"That if the particular terms of the articles of co-partnership were not known to the public, or to persons dealing with the firm in the course of the business thereof, they had a right to deal with the firm in respect to the business thereof, upon the general principles and presumptions of limited partnership *557 of a like nature; and that any secret and special restrictions contained in such articles of co-partnership, varying the general rights and authorities of partners in such limited partnerships, and of which they are ignorant, did not affect them. That the case of Livingston vs. Roosevelt, 4 Johns. Rep. 251, had been cited by the defendants' counsel as containing the true principles of law on this subject; and this court agreed to the law, as to limited partnership, as therein held by the court. That it was not denied by the defendants' counsel, and was asserted in that case, that it was within the scope and authority of partners, generally, in limited partnerships, to make and indorse notes, and to obtain advances and credits for the business and benefit of the firm; and if such was in fact the ordinary course and usage of trade, the authority must be presumed to exist. The court knew of no rule established to the contrary. That the authority of one partner in limited partnerships did not extend to bind the other partners in transactions, or for purposes, beyond the scope and object of such partnerships. That in the present articles of copartnership Winship was in effect constituted the active partner, and had general authority given him to transact the business of the firm. That he had, so far as respects third persons, dealing with and trusting the firm, and ignorant of any of the restrictions in such articles, authority to bind the firm, to the same extent and in the same manner as partners in limited partnerships of a like nature usually possess in the business or for the objects within the general scope of such a firm.
"That the articles limited the partnership to a particular period; after which it expired, unless the parties chose to give it a future existence. That no new written articles were proved in the case, and the terms and circumstances under which it was subsequently carried on, were matters to be decided upon the whole evidence. The fair presumption was, that it was subsequently carried on, on the same terms as before, unless other facts repelled that presumption. That the bond executed at the time of the execution of the articles ought to be considered as a part of the same transaction and contract."
And the said counsel of the defendants did then and there further request the said court to instruct the said jury as follows, to wit:
*558 First. That if upon the whole evidence they are satisfied that the co-partnership, proved to have existed between the defendants, under the name of John Winship, was known or understood by the plaintiffs, to be limited to the manufacturing of soap and candles, they must find a verdict for the defendants, unless they are also satisfied that these notes were given in the ordinary course of the co-partnership business, or that the moneys obtained upon them went directly to the use of the firm, with the consent of Amos Binney and John Binney; and that if they are satisfied that any part of these moneys did go to the use of the firm with such consent, that then they must find a verdict for the plaintiffs for such part only, and not for the residue. And,
Secondly. That if they are also satisfied that the Messrs Binneys furnished Winship with sufficient capital and credit for carrying on the business of the firm, no such consent can be implied from the mere fact that Winship applied these moneys, or any part of them, to the payment of partnership debts.
But the presiding judge refused to give the instructions first prayed for, unless with the following limitations, explanations, and qualifications, viz. "that the defendants as co-partners are not bound to pay the notes sued on, or money borrowed or advanced, unless the indorsements of the same notes and the borrowing of such money, was in the ordinary course of the business of the firm, for the use and on account of the firm. But if the said Winship offered the notes for discount, as notes of the firm, and for their account, and he was entrusted by the partnership as the active partner, to conduct the ordinary business of the firm, and the discount of such indorsed notes was within such business; then, if the plaintiffs discounted the notes upon the faith of such notes being so offered by the said Winship, and as binding on the firm, the plaintiffs were entitled to recover; although Winship should have subsequently misapplied the funds received from the discount of said notes; if the plaintiffs were not parties or privies thereto, or of any such intention. And if Winship borrowed money or procured any advances on the credit and for the use of the firm, and for purposes connected with the business of the firm, in like manner, and under like circumstances, and money was lent or advanced on the faith and credit of the partnership, the money so borrowed *559 and advanced bound the partnership; and they were liable to pay therefor; although the same had been subsequently misapplied by Winship, the lender not being party or privy thereto, or of any such intention.
And with these limitations, explanations, and qualifications, he gave the instructions so first prayed for.
And the presiding judge gave the instruction secondly prayed for, according to the tenor thereof.
To these opinions and decisions of the court, the defendants excepted.
A verdict was found for the plaintiffs, and judgment entered thereon; which is brought before this court by writ of error.
The exceptions will now be considered. All must admit that the opinion asked in the first instance by the counsel for the defendant in the circuit court, ought not to have been given. That court was required to decide on the fact as well as law of the case, and to say on the whole testimony, that it did not warrant giving credit to any other name than that of John Winship. But, though this prayer is clearly not sustainable, the counsel for the plaintiff in error contends, that the instructions actually given were erroneous.
The first part of the charge turns chiefly upon the definition of a secret partnership, which is believed to be correct; but the judge proceeds to say, that if incorrect, it would have no influence on the cause; and adds, "that the case must be decided on the principles of law applicable to such a partnership as this was in fact proved to be;" "that when the original articles expired by their own limitation, the question what the partnership was, and how it was carried on for the future, whether upon the same terms as were contained in the original article or otherwise, was matter of fact from the whole evidence."
The error supposed to be committed in this opinion is in the declaration, that nothing important in this case turned on the meaning or definition of the terms "secret partnership." This is not laid down as an abstract proposition, universally true, but as being true in this particular case. The articles were produced, and the judge declared that the case must depend on the principles of law applicable to such a partnership as this was in fact. This instruction could not, we think, *560 injure the plaintiff in error. Its impropriety is supposed to be made apparent by considering it in connexion with the third exception.
The second instruction appears to be unexceptionable, and the counsel for the plaintiff in error is understood not to object to it.
The third instruction asked in the circuit court, goes to the construction of the articles of co-partnership. The plaintiff in error contends, that those articles gave Winship no authority to raise money on the credit of the firm, or to bind it by his signature, for the purpose of borrowing money.
The instruction given was, that if the particular terms of the articles were unknown to the public, they had a right to deal with the firm in respect to the business thereof, upon the general principles and presumptions of limited partnerships of a like nature; and that any special restrictions did not affect them: that in such partnerships, it was within the general authority of the partners to make and indorse notes, and to obtain advances and credits for the business and benefit of the firm and if such was the general usage of trade, the authority must be presumed to exist: but that it did not extend to transactions beyond the scope and object of the co-partnership. That in the present articles, Winship was in effect constituted the active partner, and has general authority to transact the business of the firm, and a right to bind the firm in transacting its ordinary business with persons ignorant of any private restriction, to the same extent that partners in such limited partnerships usually possess.
The amount of the charge is, that if Winship and the two Binneys composed a joint company for carrying on the soap and candle business, of which Winship was the acting partner, he might borrow money for the business on the credit of the company, in the manner usually practised in such partnerships; notwithstanding any secret restriction on his powers, in any agreement between the parties: provided such restriction was unknown to the lender.
The counsel for the plaintiff in error has objected to this instruction with great force of reasoning. He contends very truly, that in fact scarcely any unlimited partnerships *561 exist. They are more or less extensive; they may extend to many or to few objects; but all are in some degree limited.
That the liability of a partner arises from pledging his name, if his name is introduced into the firm, or from receiving profits if he is a secret partner.
No man can be pledged but by himself. If he is to be bound by another, that other must derive authority from him. The power of an agent is limited by the authority given him; and if he transcends that authority, the act cannot affect his principal, he acts no longer as an agent. The same principle applies to partners. One binds the others, so far only as he is the agent of the others.
If the truth of these propositions be admitted, yet their influence on the case may be questioned. Partnerships for commercial purposes; for trading with the world; for buying and selling from and to a great number of individuals; are necessarily governed by many general principles, which are known to the public, which subserve the purpose of justice, and which society is concerned in sustaining. One of these is, that a man who shares in the profit, although his name may not be in the firm, is responsible for all its debts. Another, more applicable to the subject under consideration, is, that a partner, certainly the acting partner, has power to transact the whole business of the firm, whatever that may be, and consequently to bind his partners in such transactions, as entirely as himself. This is a general power, essential to the well conducting of business; which is implied in the existence of a partnership. When then a partnership is formed for a particular purpose, it is understood to be in itself a grant of power to the acting members of the company to transact its business in the usual way. If that business be to buy and sell, then the individual buys and sells for the company, and every person with whom he trades in the way of its business, has a right to consider him as the company, whoever may compose it. It is usual to buy and sell on credit; and if it be so, the partner who purchases on credit in the name of the firm must bind the firm. This is a general authority held out to the world, to which the world has a right to trust. The articles of co-partnership are perhaps never published. They are rarely if ever seen, except by the partners themselves. The stipulations *562 they may contain are to regulate the conduct and rights of the parties, as between themselves. The trading world, with whom the company is in perpetual intercourse, cannot individually examine these articles, but must trust to the general powers contained in all partnerships. The acting partners are identified with the company, and have power to conduct its usual business, in the usual way. This power is conferred by entering into the partnership, and is perhaps never to be found in the articles. If it is to be restrained, fair dealing requires that the restriction should be made known. These stipulations may bind the partners; but ought not to affect those to whom they are unknown, and who trust to the general and well established commercial law. 2 Hen. Black. 235. 17 Ves. 412. Gow. on Part. 17.
The counsel for the plaintiff in error supposes, that though these principles may be applicable to an open avowed partnership, they are inapplicable to one that is secret.
Can this distinction be maintained? If it could, there would be a difference between the responsibility of a dormant partner, and one whose name was to the articles. But their responsibility, in all partnership transactions, is admitted to be the same. Those who trade with a firm on the credit of individuals whom they believe to be members of it, take upon themselves the hazard that their belief is well founded. If they are mistaken, they must submit to the consequences of their mistake; if their belief be verified by the fact, their claims on the partners, who were not ostensible, are as valid as on those whose names are in the firm. This distinction seems to be founded on the idea that, if partners are not openly named, the resort to them must be connected with some knowledge of the secret stipulations between the partners, which may be inserted in the articles. But this certainly is not correct. The responsibility of unavowed partners depends on the general principles of commercial law, not on the particular stipulation of the articles.
It has been supposed that the principles laid down in the third instruction, respecting these secret restrictions, are inconsistent with the opinion declared in the first; that in this case, where the articles were before the court, the question whether this was in its origin a secret or an avowed partnership *563 had become unimportant. If this inconsistency really existed, it would not affect the law of the case; unless the judge had laid down principles in the one or the other instruction which might affect the party injuriously. But it does not exist. The two instructions were given on different views of the subject, and apply to different objects. The first respected the parties to the firm, and their liability, whether they were or were not known as members of it: the last applies to secret restrictions on the partners, which change the power held out to the world, by the law of partnership. The meaning of the terms "secret partnership," or the question whether this did or did not come within the definition of a secret partnership, might be unimportant; and yet the question whether a private agreement between the partners, limiting their responsibility, was known to a person trusting the firm, might be very important.
The proposition of the defendants in the circuit court was, that Winship had no right or authority to raise money on the credit of the firm, or to bind the firm by his signature for the purpose of borrowing money.
This can scarcely be considered as a general question. In the actual state of the commercial world, it is perhaps impossible to conduct the business of any company without credit. Large purchases are occasionally made on credit; and it is a question of convenience to be adjusted by the parties, whether the credit shall be given by the vendor or obtained at the bank. If the vendor receives a note, he may discount it at the bank. If, for example, the notes given by Winship to Jacques for rosin to carry on his manufacture, which have been mentioned by the witness, had been discounted in bank, it would not have been distinguishable from money borrowed in any other form. The judge said, that if it was within the scope and authority of partners generally, in limited partnerships, to make and indorse notes, and to obtain advances and credits for the business and benefit of the firm, and if such was in fact the ordinary course and usage of trade, the authority must be presumed to exist. Whether this was the fact or not was left to the jury.
Does any thing in the articles of agreement restrain this general authority?
*564 The articles state the object of the company to be, the manufacture of soap and candles; the capital stock to be ten thousand dollars, which sum is to be paid in by Amos and John Binney; John Winship to conduct and superintend the manufactory; the name of the firm to be John Winship; the profit and loss to be divided. They are silent on the subject of borrowing money. If the fact that the Binneys advanced ten thousand dollars for the stock in trade implied a restriction on the power of the manager to carry on the business on credit, it would be implied in almost every case.
But the bond given by Winship to Amos Binney, which is admitted by the judge to constitute a part of the partnership agreement, is supposed to contain this restriction. The condition of the bond recites that "whereas Amos Binney had engaged to indorse the notes given by the said John Winship for the purchase of stock and raw materials for manufacturing, when necessary to purchase on credit, in consideration of which the said John Winship hath engaged not to indorse the notes, paper, or become in any manner responsible or security for any person or persons, other than the said Amos Binney." "Now, if the said John Winship shall faithfully observe the conditions, and wholly abstain from becoming the surety or indorser of any person, to any amount, other than the said Amos Binney, then," &c.
The agreement recited, but not inserted in this condition, that Amos Binney would indorse the notes of Winship when it should be necessary to purchase on credit; while it implies that the power was incident to the act of partnership; was not in itself a positive restriction on that power. The affirmative engagement on the part of Amos Binney, that he will indorse, is not a prohibition on Winship to obtain any other indorser. The exigencies of trade might require the negotiation of a note in the absence of Mr Binney, and this may have been a motive for leaving this subject to the discretion of the acting partner. If he has abused this confidence, the loss must fall where it always falls when a partner, acting within his authority, injures his co-partners. If, then, the agreement between Amos Binney and John Winship contains nothing more than is recited in the condition, it contains no inhibition on Winship to negotiate notes in the ordinary course of *565 business. The restriction on Winship is not in this recital, but in his engagement expressed in the condition of the bond.
He engages not to indorse the notes, paper, or become in any manner responsible or security for any person or persons, other than the said Binney.
The obvious import of this engagement is that Winship will not make himself responsible for another. Had he made an accommodation note for Jacques, it would have been as much a violation of this agreement as if he had indorsed it. The undertaking is not to indorse notes for another. But this note is indorsed for himself. It is negotiated in bank in the name of the firm, and the money is carried to the credit of the firm. Had not Winship misapplied this money, no question would have arisen concerning the liability of his partners on this note. The stipulation in the bond, not to indorse or become security for another, would not have barred the action. But, be this as it may, this stipulation between the parties is a secret restriction on a power given by commercial law and usage, generally known and understood which is obligatory on the parties, but ought not to affect those from whom it is concealed.
The counsel for the defendants in the circuit court then prayed an instruction to the jury, that if they were satisfied that the partnership was known to the plaintiffs to be limited to the soap and candle business, they must find for the defendants; unless they were also satisfied that these notes were given in the ordinary course of the partnership business, or that the money obtained upon them went, directly to the use of the firm, with the consent of Amos Binney and John Binney; and that if they are satisfied that any part of these moneys did go to the use the firm with such consent, that then they must find a verdict for such part only; and not for the residue.
This instruction was not given as asked; but was given with "limitations, explanations, and qualifications."
The judge instructed the jury, in substance, that the defendants were not bound to pay the notes sued on, unless the indorsements thereon were in the ordinary course of the business of the firm, for the use and on account of the firm; but if they were satisfied that the notes were so offered and discounted, and that the said Winship was entrusted by the partnership, as the active partner, to conduct the ordinary business of *566 the firm, and the discount of such indorsed notes was within such business, then the plaintiffs were entitled to recover; although Winship should have subsequently misapplied the funds, received from the discount of said notes, if the plaintiffs were not parties or privies thereto, or of any such intention.
The plaintiffs in error contend, that the instruction ought to have been given, as prayed, without any qualification whatever. The instruction required is, that although the jury should be satisfied that the money went to the use of the firm, they should find for the defendants; unless they should be also satisfied, that the consent of Amos and John Binney was given to its being so applied. That is, that a note discounted by the acting and ostensible partner of a firm for the use of a firm, the money arising from which was applied to that use, could not be recovered from the firm, by the holder, unless the application was made with the consent of all the partners.
The counsel for the plaintiffs in error is too intelligent to maintain this as a general proposition. He must confine it to this particular case. He is understood as contending, that under the secret restrictions contained in the bond given by Winship to Amos Binney, Winship was restrained from discounting these notes even for the use of the firm; and that no application of the money to the purposes of the co-partnership could cure this original want of authority, and create a liability which the note itself did not create; unless such application was made with the consent of all the partners. So understood, it is a repetition of the matter for which the third exception was taken, and is disposed of with that exception. The instruction, therefore, ought not to have been given as prayed. Still, if the court has erred in the instruction actually given, that error ought to be corrected. That instruction is, that if the notes were offered in the usual course of business for the firm, by the partner entrusted to conduct its business, and were so discounted, and if such discount was within such business; then the subsequent misapplication of the money, the holders not being parties or privies thereto, or of such intention, would not deprive them of their right of action against the co-partnership.
We think this opinion entirely correct. It only affirms the common principle that the misapplication of funds raised by *567 authority, cannot affect the person from whom those funds are obtained.
We think there is no error in the opinions given by the judge to the jury. The court being divided, on the competency of Samuel Jacques as a witness. The judgment is affirmed, with costs and damages at the rate of six per coutum per annum, by a divided court.
Mr Justice BALDWIN dissenting.
The plaintiffs sue in this case as the indorsees of six promissory notes drawn by James Jacques, and indorsed by John Winship, which came to their hands as the discounters thereof, being offered by John Winship, and the proceeds thereof placed to his credit in the bank. They were not notes indorsed to the plaintiffs in payment, or as collateral security for the payment of an antecedent debt, or the performance of any pre-existing contract. The bank are prohibited in their charter from dealing in goods, unless for the sale of such as are pledged for the payment of debts. 4 L.U.S. 43. Ninth fundamental article of the charter of the bank.
This was not then the case of goods sold by plaintiffs to defendants, as partners, on the faith of the partnership in the course of their business. Neither is it a case of money previously lent, and a note or bill indorsed over in payment or security. The case finds, and the circuit court considered it a case of discount, which is a purchase of the note on stipulated and well known terms. The purchase or discount of a note is a contract wholly unconnected with the objects, uses, or application of the money paid. A party who sells a bill or note, incurs no liability to the discounter by the mere contract of discount, where he does not indorse it: nor does the discounter who pays for the discounted bill or note in other bills and notes, without indorsement, guaranty their payment. The contract is one of sale; and in the absence of fraud or misrepresentation, the rights of the parties are tested exclusively by the only contract which the nature of the case imports; of sale and purchase as of any other article in market.
Where a purchase is made or money borrowed on partnership account, an immediate debt is created: a note or bill given or indorsed is for payment of the existing debt: and if not *568 paid, the debt remains, unless the bill or note has been accepted as payment. So if the bill or note is given as collateral security. And the law is the same, whether one or all the partners do the act; there is an antecedent debt binding on all, or an indemnity to be provided; the obligation is not impaired by giving or transferring an ineffectual security. But the present case is wholly different. The defendants owed no antecedent debt to the bank, for which these notes were transferred to them. They were neither offered or accepted as payment or indemnity; but sold by Winship, and purchased by the bank at their value. That value is, in my opinion, to be ascertained with reference to the names on the bill, who are the parties to the contract, and in my view of the law, the only parties. The bank bought from John Winship the promise of James Jacques, guarantied by Winship, on known conditions. This distinction between passing or pledging a note in payment, and discounting it, has been wholly overlooked in the opinion of the circuit court; and the case seems to have been considered throughout as governed by the same rules which apply to purchases, loans, and other partnership engagements. The case before them was a pure case of discount, which is governed by its own principles; which, in my opinion, would have produced a different result in the cause, had they been laid down to the jury.
These principles are fully illustrated and established in their various bearings on cases which have been adjudicated, and laid down in terms too clear not to be understood. 15 East's Rep. 10, 11. Doug. 654, note. 3 Ves. Jun. 368. 10 Ves. Jun. 204. 3 Durnf. and East, 757. 1 Lord Ray. 442. 2 Com. Rep. 57, S.C. 1 Cranch, 192. 6 Cranch, 264. 1 Wash. C.C.R. 156, 321, 328, 399. 3 Wash. C.C.R. 266. 9 Johns. Rep. 310. Burke's Cases in Bankruptcy, 114, 170. 3 Mad. Rep. 120. 1 Esp. N.P. 448. I do not refer to the latter case, because it ought to be any authority in this court; but because it shows that Lord Kenyon, who dissented from the court of king's bench in 1790, in the case quoted from 3 Durnf. and East, 757, came to the same opinion in 1796. Neither do I rely on elementary writers who lay down the same positions; but on the adjudged cases, which seem to me to be the safest guides to the law. "Satius est petere fontes, quam sectari rivulos." 10 Coke, 118.
*569 Resting on these authorities, I shall consider the case on the evidence as one of discount, not of loan, purchase or any other pre-existing liability. As the evidence of Jacques proves that these notes were accommodation, and not notes of business; as Mr Harris, the discount clerk, testifies that all the notes were discounted at Winship's request, and the proceeds passed to his credit; that it is easy to distinguish accommodation notes from others; and that he considered these in suit to be of that description; and that the bank had frequently discounted notes drawn by Winship, and indorsed by Amos Binney: and Mr Parker, one of the directors of the bank, testified, that when the bank discounted these notes, it was understood that Amos and John Binney were bound by them. Witness understood that they were bound as partners in the soap and candle business, not general partners. Did not know as to John Binney, whether plaintiff considered him answerable, but that they did so consider Amos Binney; that a number of notes of this kind were discounted, while other notes indorsed by Amos Binney were in bank; that Amos and John Binney were engaged in large business as merchants, and witness does not know that any one ever supposed defendants to be partners, except in the manufacture of soap and candles.
I cannot do injustice to the plaintiffs by founding my opinion on this testimony. Mr Parker was present at the making of the contract of discount of these notes; he was one of the agents of the bank in making it, and a party to it, as a member of the corporation, directly interested. His evidence is the solemn admission on oath of a party to the contract, and ought to be taken as true. The defendants have a right to its full benefit as explanatory of the nature, terms, and circumstances under which it was made. Mr Harris, the discount clerk, was the appropriate agent of the bank in consummating the contract of discount, by paying to Winship the proceeds of the discounted notes; and I cannot err in saying from the record, that these were the only witnesses examined at the trial touching the discount of these notes; the only contract, in my opinion, which the law raises between the plaintiffs and defendants. What, then, was the obligation which this contract of discount, as proved by Harris and Parker, imposed on Amos and John Binney, by the bank's purchasing these notes *570 at the request of John Winship, and paying or passing the proceeds to his credit?
The notes were accommodation, so understood by the plaintiffs, and discounted as such. The bank, then, knew that they were not what they purported to be; they are set forth in the record, are all drawn for value received, and thus bear a falsehood on their face, known to the bank. Such notes, Mr Harris says, are easily distinguishable from notes of business; and the bank did not discount them as representing a purchase, a loan, or any pre-existing obligation by Jacques to pay the amount to Winship, but as the lending of his name by Jacques to Winship, to enable him to raise money by the sale of the notes. There was in this respect no fraud on the bank. They knew they were not purchasing notes given and indorsed in the usual course of business. They did not come to their hands as innocent indorsers, taking them to be what they imported to be, for value received. The bank are purchasers, it is true, for a valuable consideration; but not innocent, or without notice. They took the notes with a known taint on their very face, which can only be effaced by some subsequent indorsee or holder, who takes them in the course of business without notice, and takes them as between the payor and payee, as having been given for value received. But the plaintiffs have become the indorsees by discount, knowing that by the acknowledged principles of commercial law, as between the original parties in all their relations, Winship was the drawer and Jacques the indorser. As between them and the bank, their relations were the same, whether the notes were of business or accommodation: they were liable in the capacities they respectively assumed on the face of the notes. When the discounter or the indorsee of an accommodation note, known by him to be such, seeks to recover the amount from a person whose name does not appear on the note, he must prove that the person charged had made himself a party to the note; had authorized its negotiation or transfer, previously, or afterwards assented to, ratified, or adopted the indorsement as his own. Had there been no previous connexion between the Binneys and Winship, and the Binneys had procured the discount from the bank without their indorsement, they would be no more answerable to the bank than by receiving payment of a check. *571 On the face of these notes the Binneys are strangers to the bank. The contract of discount which they made with Winship, does not, per se, create one with the Binneys. Being accommodation notes, they were discounted as such; that is, as the notes of Winship indorsed by Jacques; for such is the acknowledged character of such notes in the commercial world. The line separating business from accommodation paper, is clearly defined by law and usage. There is the same difference between the indorser of a note known not to be what it purports to be, and one which represents a real debt from the drawer to the drawee, as between the purchasers of real estate with or without notice of an incumbrance, or the defect of title; so far as respects their standing in courts of justice, in relation to third persons, not parties to the contract. Those who purchase in good faith, without notice of fraud, and pay their money, confiding in the face of the transaction, ignorant of any thing which can affect its legal or equitable character, are entitled to the protection of all courts as their most favoured parties.
A peculiar sanctity is thrown round the obligation of negotiable paper, actually negotiated in the usual course of business, and in the hands of an innocent holder, for a valuable consideration, without notice. Every presumption which the law can raise, is in favour of such a holder, whether he receives the note in payment, or by discount. It becomes divested of this peculiar obligation, when the paper in its original concoction or negotiation becomes divested of these attributes, and remains in the hands of a holder who has a knowledge of all the circumstances attending both. I know of no decision of any court, no principle of law, nor usage of merchants, which confounds the distinction between these two kinds of paper in the hands of indorsees, with or without notice; it is too well established to require support from argument or authority. The same distinction exists in paper negotiated after it is due, or partnership notes given for the private debt of a partner. Notice is the distinguishing criterion in all these cases, and settles the question as to the burthen of proof. So I find the law laid down by the supreme court of Massachusetts, in the case of the Manufacturing and Mechanics' Bank vs. John Winship, et al. 5 Pickering, 11. The suit was brought on an accommodation *572 note drawn by John Winship to Jacques or order, indorsed by him and discounted by the plaintiffs in the usual course of banking business. The chief justice charged the jury, that the burthen of proof was in the plaintiffs; and that if no proof was given by them that the money was raised for the business of the firm at the manufactory, the jury should find the fact for the defendants. In giving judgment for the defendants, the court affirmed the charge of the chief justice as to the burthen of proving the note to have been given on partnership account being on the bank; that no recovery could be had against the partners, so long as it remained doubtful whether they have or have not made the contract declared upon; that from the fact of the note being found to be an accommodation one between Winship and Jacques, it would seem more likely that it related to the private concerns of Winship than to those of the partners; at any rate, the uncertainty resting on the face of the note would still continue. The plaintiffs knew or might have known that Winship was openly engaged in commercial speculations, which were wholly unconnected with the business of the manufactory; and that his signature might relate to one concern as well as another. If, therefore, they meant that the note should be enforced against the partnership, they should have ascertained that the signature of Winship was intended for the signature of the firm. But they made no such inquiry, and it does not appear that Winship or Jacques ever made any representation to that effect. And although it appears that the plaintiffs supposed the Binneys would be answerable, because they were partners with Winship in the manufactory, yet they gave no intimation whatever to the parties to the note to be discounted, that such was their understanding of the contract.
There are few courts whose opinions may be more safely confided in, as to the rules of the common law; there is none whose authority I feel more bound to respect, as to the common law of Massachusetts, than its highest judicial tribunal. The law of the state where a contract is made and carried into effect, seems to me to be the law which must control its obligation; and until evidence of the common law of that state more imposing than the solemn decision of its supreme court *573 is furnished me, I feel it my duty to respect and adopt it: believing that in doing so, I violate no principle which has ever been sanctioned by this court. In some particulars the evidence in the cause referred to was more favourable to the bank than in this. The note was discounted at the bank, on the belief that the Binneys were liable as partners of the manufactory at Charlestown only. This was found by the jury: but it was not found, and there appears to have been no evidence that the bank or its officers knew the note to be an accommodation one. The judgment of the court was on the fact being so found, not on its being known to the plaintiffs.
In this case the notice is brought home to the plaintiffs by the evidence of their discount clerk. Mr Parker, the director, does not say the note was discounted on the belief that the Binneys were liable as partners; all he says on that subject is, when the bank discounted these notes, it was understood the Binneys were bound by them. He immediately corrects this, and says, he does not know as to John Binney, whether plaintiffs considered him answerable; but they did so consider Amos Binney. This is certainly very lame evidence of the notes being discounted on the credit of both Amos and John Binney; and much weaker than the fact found by the jury in the other case. The bank had notice of the course of business between Winship and Amos Binney, by his indorsing Winship's notes, and the bank discounting them. The Binneys were in good credit; and being reputed wealthy, it was not to be presumed they would borrow credit from Jacques. These circumstances ought to have put the bank on inquiry, as Binney was a customer residing in the place. The court placed no reliance on these circumstances, or on the fact of the notes being discounted with the knowledge that they were notes of accommodation.
Nor did the court, in my opinion, correctly define the difference between a dormant and an open partnership. It seems to me to be this: where the names of the partners do or do not appear in their accounts, their advertisements or their paper; where the business is carried on in the name of all, it is open; but if any are kept back, it is dormant: that the knowledge which the public may have is not the test, when it is acquired from the acts or declarations of the acting *574 avowed partners: it may enable them to reach the dormant one, if the transaction is one in which he had an interest, but does not alter its nature. The partnership remains dormant as to all, whose names do not appear on its transactions. The dormant, the sleeping, inactive partner may be known by reputation, or the declaration of his co-partner, but these do not make him an avowed or active one without the avowal and pledge of his name or paper. If credit is given to the other names on the faith of such reputation or representation, the persons so trusting must do it at the risk of suffering, if their information is not true. The declarations of one of a firm are not evidence of another person's being a partner, in any particular transaction, unless a previous connexion is established, which gives him authority to bind by his acknowledgement, or proof given of subsequent assent: reputation is not, per se, evidence, unless brought home to the party charged; then his silence may be deemed acquiescence or assent. 11 Serg. and Rawle, 362. 2 Wash. C.C.R. 388, 390. 14 Johns. Rep. 215. 3 Caines, 92. 10 East. 264. 5 Pick. 415, 417. 1 Gall. 635, 638, 640.
The language of some of the cases is, that it is rather on the ground of agency, than partnership resulting from the community of interest in the subject matter of the contract. The principle which makes a dormant partner liable is this: having an interest in the profits which are a part of the fund to which a creditor looks for payment, he shall be bound. 2 Black. Rep. 1000. 2 Hen. Black. 247. 4 East. Rep. 144. 16 Johns. Rep. 40. 2 Nott and M'Cord, 427, 429. 1 Hen. Black. 45, &c. As his name is not pledged, his liability arises only from his interest, 16 East. 174, 175; and the burden of proving such interest is on the party suing. The language of the court, in 2 Nott and M'Cord, 429, is very emphatic. "To charge defendant as partner, one of two things is necessary; either he must have permitted his name to be used as one of the firm, thereby holding it out as a security to the community; or he must have participated in the profits." As the Binneys never pledged their names on these notes, they were not discounted on their faith. There is then wanting in this case that fact on which the power of one partner to bind the firm by negotiable paper is created, the use of the names. *575 The plaintiff who seeks to make those parties to a note, whose names do not give it currency or credit, must make them parties by affirmative proof of an interest in profits, previous authority, or subsequent recognition. It is true, that when a dormant partner is discovered, he is liable; but then he must be shown to be one by an interest in the subject matter of the note. Till this is brought home to him, he is no party to it. I know of no authority for saying, that the mere existence of a partnership composed of names not avowed or pledged to the public, makes them when discovered liable for any other than contracts in which they have an interest; one who suffers his name to be used on paper is liable as a partner, though there is in fact no existing partnership; but the man who does not suffer his name to be used or pledged, is bound only by virtue of his interest.
This furnishes, I apprehend, the true distinction between dormant and open partnerships, and that it does not depend on the knowledge which the public may have, or the representation made by the contracting partner, when he is giving or negotiating a note. The reason which makes a note drawn or indorsed by one partner, in the joint name, though for his own use, binding on the firm in the hands of an innocent holder, is, because it has been taken on the faith of his name. 3 Kent. Com. 18. The case of Van Ramsdyke's vs. Kane, shows the importance attached to the names of the partners appearing on a bill. One partner was authorized by the others to take up money on the credit of the partnership concern, and draw bills therefor on a house at A. He took up money, drew a bill directing it to be charged on the account of all the partners: but it was signed by himself alone: the court held, that the representative of a deceased partner was liable in equity to a payee, who trusted his money on the faith of the joint credit: but expressed themselves with great doubt and caution as to the liability of the partners at law. 2 Gall. R. 30.
It seems to me that the circumstance which would excite a doubt in that case would remove it in this. But when all the names are not used, the reason and the law cease together. Where the liability attaches to the name, proof of the signature is enough: where it depends on the mere participation of the *576 profits, that must be proved by the holder: as he claims to hold persons bound whose names were not held out on the paper as inducements to take it, he must show that the law has placed their names upon it. In proving a partnership assignment, it must appear that the party making it had a right to sign the name of the firm, and that his act is the act of all the partners. 5 Cranch, 300. A party claiming the money due on a note, indorsed to him in the name of the firm, must show the indorsement to be made in the name of the firm by a person duly authorized. 7 Wheat. 669. The case of Leroy vs. Johnson in this court, 1 Peters, 186, was this. Hoffman and Johnson were partners, under the firm of Hoffman and Johnson; so advertised in the papers, so publicly known, and so carried on, under articles of partnership. Hoffman drew a bill on London, in Alexandria, in his own name, which the plaintiff, residing in New York, purchased from Hoffman. The bill was drawn to raise money to pay a note of the firm, and sent to New York by Johnson for the purpose of selling it. Not succeeding, Hoffman went on, and assisted by letters or recommendation from merchants of Baltimore, negotiated the bill, and with the proceeds paid a partnership note. The circuit court of the district were asked to instruct the jury, 1. That on the evidence of partnership and the application of the proceeds of the bill to partnership purposes; 2. That if the bill was drawn with reference to the business of the concern; 3. That if the name of Jacob Hoffman was sometimes used in relation to the business of the firm, that the bill was drawn in his name, and so negotiated for the firm, and to pay their debts: that the plaintiff was entitled to recover. These instructions were refused, and judgment rendered for the defendant, which was affirmed: this court holding it indispensable for the plaintiff to prove, that the name of Hoffman was used in the transaction as the name of the firm, and that the parties so traded and carried on their business; that the jury would be well warranted from the facts of the case in believing that Hoffman dealt in his individual name, and on his sole responsibility, without even an allusion to the partnership; though the bill was drawn for partnership purposes, with the knowledge of Johnson, and by him sent to New York for sale, *577 and the proceeds applied in good faith. The attention of the court was not drawn to the distinction between notes discounted, and those received in payment; nor was the bill in question an accommodation one. There was no fraud in the transaction, as between the partners. It was drawn, negotiated, and the proceeds applied, with the consent of both, and the aid of letters of recommendation. It came to the hands of the holder by fair purchase in market, in the usual and regular way of business; yet Johnson was not bound: his name was not on the bill; the plaintiff did not prove it to be the name of the firm in the particular transaction, though Hoffman's name was sometimes used alone in partnership transactions.
If, in addition to these defects in the plaintiff's case, it had appeared that the bill drawn in the name of Hoffman had been one of accommodation, known to Le Roy to be so, and purchased as such, without the knowledge of Johnson of its having been drawn or negotiated, or the application of its proceeds to partnership purposes, and with a knowledge by Mr Le Roy, derived from his having been in the frequent habit of discounting bills drawn by one and discounted by the other, understanding there was a special partnership between them; it is not presuming too much to think, that this court would have deemed these circumstances strong presumptive proof and reasonable notice of their accustomed mode of raising money for partnership purposes, by discount; and that a known accommodation note drawn by a stranger, and indorsed by Hoffman alone, was not a partnership note, when offered by him for discount, without the name of Johnson. It would seem to me to furnish the very case which this court, in delivering their opinion in Le Roy vs. Johnson, make a proviso of the liability of the members of a firm, whose names appear on a bill negotiated, and in the hands of an indorsee. The court say: a bill drawn or accepted by a firm, by their usual name and style, is presumed to be on their joint account and authority, and that third persons are not bound to inquire whether it was so done or not, "unless the contrary be shown, and that the persons with whom the partner deals had notice or reason to believe that the former was acting on his separate account." This restriction to the liability of partners, whose names appear *578 on a joint note in the hands of an indorsee, to whom the faith of a partnership is publicly pledged, seems to me conclusive in a case circumstanced like this; where the agents, who effect the discount of the note in question for the bank, prove distinctly their own knowledge of the nature, extent and objects of the partnership, the mode adopted to raise funds for the firm in the same bank, and of these notes being for the accommodation of Winship, and his receiving the proceeds.
Under the circumstances of this case, I cannot consider the plaintiffs as innocent indorsees of the negotiable paper of a firm actually negotiated by them on its pledged credit, without notice or reason to believe that Winship was acting on his separate account. The testimony of Harris is conclusive on my mind to prove, that the officers of the bank perfectly understood the nature of the transaction; that the notes were not discounted on any representation made by Winship, or on the belief that they were the notes of the firm. The bank may have thought the Binneys, or one of them, liable; but according to the testimony of Parker, could not have believed the indorsement to represent a regular and authorized partnership transaction. The statement of Mr Parker was at first that they understood the Binneys were liable, but he afterwards corrected himself and said, he did not know, as to John Binney, whether the plaintiffs considered him so answerable, but that they so considered Amos Binney. They evidently thought Amos liable because he had been in the habit of indorsing Winship's notes, but could by no possibility have believed Amos and John liable as partners under the signature of Winship, when one of the directors who made the discount could not say that the bank ever considered John Binney to be liable.
Finding, on a careful examination of the charge of the circuit court, that none of the restrictions and qualifications of the liability of a dormant partner, whose name does not appear in an indorsement of an accommodation note, discounted under known circumstances of suspicion, have been laid down or explained to the jury; I am constrained to say that it is erroneous, and that the judgment ought to be reversed. I cannot, on a subject so important as this, silently dissent from the opinion of the court, when my judgment has been made up on *579 what seems to me the best established principles of commercial law: nor can I consent to overrule a decision of the supreme court of the state where this contract was made, executed and enforced; without the highest possible evidence of their having been mistaken in their judicial exposition of their common law.
This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Massachusetts, and was argued by counsel; on consideration whereof it is considered, ordered, and adjudged by this court, that the judgment of the said circuit court in this cause be, and the same is hereby affirmed, with costs and damages, at the rate of six per centum per annum.